FILED

MAR 12 2024

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

William Parker
_____
Plaintiff(s),

vs.

Edward C. Gainey
_____
Defendant(s).

Case No. 2:23-CV-2102

## Motion for Extention
*(Title of Pleading)*

The plaintiff William Parker respectfully request an extention to respond to this courts February 20, 2024, Order. The plaintiff is in between housing and didn't recieve a copy until March 12, 2024.

Dated: 3/12/2024    Signed: William Park

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MONROE WEEKLEY, III,
            Plaintiff,

            v.

SGT. PROVIDENT, et al.,
            Defendants.

:
:
: CIVIL ACTION No. 1:22-cv-00279
:
: JURY TRIAL DEMANDED
:
:
:
: MAGISTRATE JUDGE
: KEZIA O.L. TAYLOR

**FILED**

MAR 1 2 2024

CLERK U.S. DISTRICT COURT
WEST DIST OF PENNSYLVANIA

PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS

In accordance with Local Rule 56.C.3., Plaintiff, Monroe Weekley, III, respectfully submits the following in response to Defendants' Concise Statement of Material Facts Pursuant to Local Rule of Civil Procedure 56.B.1.

I. RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.   Plaintiff, Monroe Weekley, ("Weekley"), is an inmate currently incarcerated at the State Correctional Institution ("SCI") at Albion. See Document No. 10.

    ANSWER:  Admitted

2.   On December 9, 2022, Weekley initiated a civil rights action pursuant to 42 U.S.C. §1983. See Document No. 10.

    ANSWER:  Admitted

3.   The named Department of Corrections ("DOC") Defendants

are Sgt. Provident, Ebony Frith, Sgt. Cole, and Corrections Officer ("CO") Drayer. See Document No. 10.

ANSWER:  Admitted

4.    Weekley asserts a First Amendment retaliation claim against all Defendants, for which he seeks punitive damages in the amount of $250,000. See Document No. 10.

ANSWER:  Admitted

5.    On March 25, 2023, the Defendants filed a motion to dismiss the complaint, along with a supporting brief. See Document Nos. 32, 33.

ANSWER:  Admitted

6.    On August 4, 2023, Weekley filed a brief in opposition to Defendants' motion to dismiss. See Document No. 40.

ANSWER:  Admitted

7.    On September 12, 2023, Magistrate Judge Pupo Lenihan issued a memorandum opinion and order, denying Defendants' motion to dismiss. See Document No. 41.

ANSWER:  Admitted

8.    Defendants filed an answer to the complaint, with affirmative defense, on September 20, 2023. See Document No. 42.

ANSWER:  Admitted

9.   In the complaint, Weekley avers that Sgt. Provident conspired with Sgt. Cole and Officer Drayer, to issue misconducts in retaliation for his previously submitted Prison Rape Elimination Act ("PREA") allegation. See Document No. 10.

ANSWER:  Admitted

10.   On December 10, 2019, Weekley submitted grievance No. 838943, averring he had "witnessed a PREA violation" involving Sgt. Provident and CO Martini. See Document No. 40-1.

ANSWER:  Admitted

11.   The grievance, which was submitted under DC-ADM 804, "Inmate Grievance," was rejected because policy provides that PREA allegations will be investigated pursuant to DC-ADM 008, "Prison Rape Elimination Act (PREA) Procedures Manual". See Document No. 40-1; Exhibit E [Excerpt from DC-ADM 804].

ANSWER:  Admitted

12.   Therefore, in conformity with DOC policy, the grievance was forwarded to the security office and the PREA compliance manager. See Document No. 40-1; Exhibit E.

ANSWER:  Admitted

13.   When an inmate reports an incident that he designates as a PREA violation, it is referred for investigation, to the institution's Security Captain and the PREA compliance manager, who is typically the Corrections Classification Program Manager

at the institution. See Exhibit A [Declaration of Lt. Tricia Bashor].

    ANSWER:  Admitted

14.  During the time relevant to the claims presented in the complaint, Lt. Tricia Bashor was the PREA investigator for SCI-Albion. See Exhibit A.

    ANSWER:  Admitted

15.  If the reported situation meets the criteria to initiate a PREA investigation, the Security Captain will assign the matter to the PREA investigator to begin the investigative process. See Exhibit A.

    ANSWER:  Admitted

16.  On the other hand, when the Security Captain and the institution's PREA compliance manager determine that the inmate's claim does not meet the standards set forth in PREA and DC-ADM 008, no further investigative action will be taken. See Exhibit A.

    ANSWER:  Admitted

17.  Prior to April 2019, allegations that did not meet the guidelines to trigger a PREA investigation, were not tracked at the institution. See Exhibit A.

    ANSWER:  Admitted

18.    In April 2019, Department policy was updated to require PREA staff to enter these "no allegation established" events into the DOC's PREA tracking system. See Exhibit A.

ANSWER:  Admitted

19.    In December 2019, Brenda Reighard, was employed as the PREA Administrative Officer at SCI-Albion and tasked with entering the "no allegation established" events into the tracking system. See Exhibit A.

ANSWER:  Admitted

20.    When Ms. Reighard subsequently passed away, Lt. Bashor accomplished the task of upholding the system regarding all PREA allegations and outcomes, including "no allegation established" events. See Exhibit A.

ANSWER:  Admitted

21.    The PREA tracking system does not contain any information regarding Weekley's PREA allegations from December 10, 2019. See Exhibit A.

ANSWER:  Admitted

22.    DOC records do not contain any indication that institutional staff determined further investigation was warranted based upon the information provided by Weekley at that time; therefore, it should have been entered into the system as a "no allegation established" events. See Exhibit A.

ANSWER:  Admitted

23.  Because Ms. Reighard has passed away, Lt. Bashor is unable to verify why the December 10, 2019 allegation was not entered into the PREA tracking system. See Exhibit A.

ANSWER:  Admitted

24.  The DOC has an Inmate Grievance System that provides an administrative procedure by which inmates may seek resolution of issues-namely, policy DC-ADM 804. See Exhibit K [Declaration of Keri Moore].

ANSWER:  Admitted

25. If attempts at informal resolution fail, the grievance policy provides a three-step process for resolution of inmate grievance: (1) the initial grievance at the institutional level; (2) an appeal to the Facility Manager (Superintendent); and (3) an appeal for final review to the Secretary's Office of Inmate Grievances ("SOIGA"). See Exhibit K.

ANSWER:  Admitted

26.  An appeal to final review must comply with the requirements set forth in DC-ADM 804 for the submission of appeals to SOIGA--if not, then the appeal will be dismissed. See Exhibit K.

ANSWER:  Admitted

27.  The grievance process requirements are fully outlined in

the current version of DC-ADM 804, which has been in effect since
May 1, 2015. See Exhibit E; Exhibit K.

ANSWER:  Admitted

28.  Though the Department's Inmate Handbook, inmates are
provided with notice of the grievance policy and the requirements
they must meet when grieving their issues pursuant to this
policy. See Exhibit K.

ANSWER:  Admitted

29.  Pursuant to DC-ADM 804, the inmate "shall identify all
individuals directly involved", and include "the date,
approximate time, and location of the event(s)". Further, "[i]f
the inmate desires compensation or other legal relief normally
available from a court, the inmate must request the specific
relief sought in his/her initial grievance". See Exhibit E.

ANSWER:  Admitted

30.  The DOC's grievance procedure was available to and
utilized by Weekley, as evidenced by his grievance history and
his submission of grievances to final review. See Exhibit B
[Declaration of Michele Tharp]; ExhibitC [Grievance History];
Exhibit K.

ANSWER:  Admitted

31.  Keri Moore, Chief Grievance Officer within SOIGA, is a
records custodian for all grievance appeals submitted to final

review; SOIGA maintains a record in the Automated Inmate Grievance Tracking System of inmates' appeals to final review and SOIGA's responses thereto. See Exhibit K.

ANSWER:  ADMITTED

32.  DOC Defendants raised the affirmative defense of failure to exhaust in their answer to the complaint. See Document No. 42.

ANSWER:  ADMITTED

33.  On April 14, 2021, Weekley submitted grievance No. 923794, alleging he was issued frivolous misconducts and removed from his housing unit/work assignment, in retaliation for filing a PREA complaint. See Exhibit B; Exhibit D [Grievance No. 923794].

ANSWER:  ADMITTED

34.  Grievance No. 923794 is the only grievance Weekley submitted to final review, regarding the allegations in the complaint. See Exhibit D; Exhibit K.

ANSWER:  ADMITTED

35.  Weekley alleged he was removed from the honor block for a "reason unknown". Further, he alleged Sgt. Provident "targeted" him in the form of frivolous misconducts and "confronted" him in his cell, in retaliation for the previously filed PREA complaint. See Exhibit D.

ANSWER:  ADMITTED

36. Concerning Ms. Frith, Weekley claimed he "notified [her] about an attempt to" have him removed from his work assignment and housing unit. See Exhibit D.

ANSWER: ADMITTED

37. The grievance does not name or reference Defendants Cole and Drayer or the misconducts they issued. See Exhibit D.

ANSWER: DENIED. Defendants Cole and Drayer were referenced by Plaintiff's statement that he was targeted by Defendant Provident in the form of issuing frivolous misconduct reports, since Defendant Provident never issued misconducts himself, the reference is that Defendant Provident persuaded and/or ordered Defendants Cole and Drayer to issue the misconducts. See Plaintiff's Brief in Opposition to Motion for Summary Judgement. ("Brief in Opposition").

38. The grievance form instructs inmates to "state all relief that you are seeking", and in grievance No. 923794, Weekley indicated, "[f]or relief I would like to have my job back and put back on D/B unit". See Exhibit D.

ANSWER: ADMITTED

39. Weekley did not request monetary damages in the grievance. See Exhibit D.

ANSWER: DENIED. Before the grievance was remanded to the Initial Grievance stage, Plaintiff sought compensation by

requesting to be paid for "all the money" he lost as a result of this incident. See Brief in Oppsition.

40.  The grievance investigation revealed that the reason Weekley was removed from the honor unit was because the unit management team determined Weekley's disruptive behavior rendered him ineligible to remain on the honor block, which in turn, left him ineligible to continue in his work assignment; therefore, the grievance was denied and upheld through to final review. See Exhibit D.

ANSWER:  Admitted to the extent that the investigation was made to reveal that Plaintiff's removal from his housing unit was because the Unit Manager team determined that Plaintiff was displaying disruptive behavior. Denied to the extent that Plaintiff has never displayed the disruptive behavior mentioned. See Brief in Opposition. See also Above Average Positive Housing Reports at Attachment B.

41.  Lt. Bashor investigated the allegation in grievance No. 923794, relative to the referenced PREA complaint. See Exhibit A.

ANSWER:  DENIED. Plaintiff is not aware Lt. Bashor investigated anything in relation to grievance No. 923724.

42.  When Lt. Bashor questioned Sgt. Provident, he advised that he had no knowledge of this PREA complaint or the incident to which Weekley had alluded, nor was he previously questioned about the PREA complaint. See Exhibit A; Exhibit J [Declaration of Dean Provident].

ANSWER:  DENIED. See answer at No. 41 above.

43.  Institutional records do not contain any indication that Sgt. Provident was advised of or questioned regarding this PREA allegation, prior to Weekley's submission of grievance No. 923794. See Exhibit A.

ANSWER:  DENIED. Everything in the institution is not tracked, logged, or reported. See, i.e. DOC DEFENDANTS' STATEMENT OF MATERIAL FACTS, at Nos. 19 through 23. Denied also, to the extent that it is well known that events and knowledge of events can be disseminated amongst people without any indication or records of said dissemination.

44.  Further, DOC records reflect that no PREA allegations have ever been established, nor have any adverse PREA findings ever been made, concerning Sgt. Provident. See Exhibit A.

ANSWER:  DENIED. See answer at No. 43 above.

45.  In the complaint, Weekley avers that misconduct Nos. D524936 and D207763, were issued in retaliation for his December 2019 PREA complaint. See Document No. 10.

ANSWER:  ADMITTED

46.  First, on January 3, 2021, Sgt. Cole, issued misconduct No. D524936. At that time, Sgt. Cole held the rank of Corrections Officer. See Document No. 10; Exhibit B; Exhibit F [Misconduct History]; Exhibit G [Misconduct No. D524936]; Exhibit N [Declaration of Vincent Cole].

ANSWER:  ADMITTED

47.  According to Weekley, "[o]n January 3, 2021, Defendant Provident was the ranking officer and supervisor of Defendant Cole. Defendant conspired together to issue Misconduct No. D524936 in retaliation for the filing of the PREA Complaint against Defendant Provident". See Document No. 40.

ANSWER:  ADMITTED

48.  Sgt. Provident and Sgt. Cole never discussed any PREA allegations or issues concerning Weekley. See Exhibit J; Exhibit N.

ANSWER:  DENIED. See Brief in Opposition.

49.  Prior to receiving and reviewing Weekley's civil complaint in this matter, Sgt. Cole was unaware of Weekley's December 2019 PREA claim. See Exhibit N.

ANSWER:  DENIED. See Brief in Opposition.

50.  Sgt. Cole issued misconduct No. D524936 because he observed what he believed to be a violation of institutional rules. See Exhibit G; Exhibit N.

ANSWER:  DENIED. See Brief in Opposition.

51.  Sgt. Providence never suggested, forced or otherwise solicited Sgt. Cole to issue a misconduct to Weekley. See Exhibit N.

ANSWER:  DENIED. See Brief in Opposition.

52.  Sgt. Cole did not discuss misconduct No. D524936 with Sgt. Provident at any time, either before or after he issued it. See Exhibit N.

ANSWER:  DENIED. See Brief in Opposition.

53.  The ranking officer on duty when Sgt. Cole issued the misconduct was Lt. Scott, who reviewed and approved misconduct report No. D524936 for the charges of refusing to obey an order and failure to stand count or interference with count. See Exhibit G; Exhibit N.

ANSWER:  Denied, to the extent that Defendant Provident was the ranking officer on Plaintiff's housing unit when Misconduct No. D524936. Admitted, to the extent that Lt. Scott was the ranking officer of the zone in which the housing unit is located. See Brief in Opposition.

54.  On January 4, 2021, the hearing examiner dismissed the misconduct charges with prejudice, after determining that Sgt. Cole had listed the incorrect charges in the report. See Exhibit G; Exhibit N.

ANSWER:  ADMITTED

55.  Sgt. Provident was not Sgt. Cole's regular shift sergeant between 2019 and 2021, during which time, they worked together on only a few occasions. See Exhibit N.

ANSWER:  ADMITTED

56.  When misconduct No. D524936 was issued, Sgt. Provident
and Sgt. Cole were working different shifts within the
institution. See Exhibit B; Exhibit H [Shift Schedules, January
3, 2021].

ANSWER:  DENIED. See Brief in Opposition.

57.  Sgt. Provident was working the first shift, which is
from 6:00am to 2:00pm. See Exhibit B; Exhibit H.

ANSWER:  DENIED. See Brief in Opposition.

58.  Sgt. Cole was working the second shift, which is from
2:00pm to 10:00pm. See Exhibit B; Exhibit H.

ANSWER:  ADMITTED

59.  Further, Sgt. Provident was not working or present in
the institution on January 3, 2021. See Exhibit B; Exhibit H.

ANSWER:  DENIED. See Brief in Opposition.

60.  Next, Weekley avers that Sgt. Provident conspired with
CO Drayer to issue misconduct No. D207763. See Document No. 10;
Document No. 40-3.

ANSWER:  ADMITTED

61.  Weekley contends that "[o]n March 26, 2021, Defendant
Provident was the ranking Officer and Supervisor of Defendant

Drayer" and they "conspired together to issue Misconduct No. D207763 to further retaliate against Plaintiff for the filing of the PREA complaint filed against Defendant Provident". See Document No. 40.

ANSWER: ADMITTED

62. CO Drayer worked at SCI-Albion from November 2020 through October 2021, during which time she rarely worked with Sgt. Provident, who was not her regular shift sergeant. See Exhibit O [Declaration of Amanda Drayer].

ANSWER: ADMITTED

63. Sgt. Provident and CO Drayer never discussed any PREA allegations or other issues with any inmates. See Exhibit O.

ANSWER: DENIED. See Brief in Opposition.

64. Sgt. Provident never suggested, forced or solicited CO Drayer to issue a misconduct to Weekley. See Exhibit O.

ANSWER: DENIED. See Brief in Opposition.

65. CO Drayer issued misconduct No. D207763 because she observed what she believed to be a violation of institutional rules. See Exhibit O.

ANSWER: DENIED. See Brief in Opposition, see also Attachment S.

66. Specifically, when CO Drayer observed Weekley on the top

tier of the block, she asked him why he was out of his cell. Weekley stated, Sgt. Provident "said I could be out right now and he lets me switch my time everyday". See Document No. 40-3.

ANSWER:  DENIED. See answer to No. 65 above.

67.  CO Drayer asked Sgt. Provident if he had given Weekley permission to be out of his cell at that time. Sgt. Provident informed her that he had not given Weekley, or any other inmate, permission to be out of their cells at any time other than their scheduled time. See Exhibit O; Document No. 40-3.

ANSWER:  DENIED. See answer to No. 65 above.

68.  In addition to being out of his cell at the time CO Drayer observed him, her report noted that he also received his "normal block out time". See Document No. 40-3.

ANSWER:  DENIED. See answer to No. 65 above.

69.  Because Weekley did not have permission to be out of his cell when CO Drayer had observed him, she issued a missconduct and listed Sgt. Provident as a witness. See Document No. 40-3.

ANSWER:  DENIED. See answer to No. 65 above.

70.  Sgt. Provident was not CO Drayer's ranking officer on duty and was not responsible for approving misconduct No. D207763. See Exhibit O; Document No. 40-3.

ANSWER:  DENIED. See Brief in Opposition.

71.  Sgt. Provident never directed any corrections staff to issue Weekley a misconduct. See Exhibit J; Exhibit N; Exhibit O.

ANSWER:  DENIED. See Brief in Opposition.

72.  The following charges were listed on misconduct No. D207763: breaking restriction, quarantine, or informal resolution sanction; lying to an employee; and presence in an unauthorized area. See Document No. 40-3.

ANSWER:  ADMITTED

73.  Weekley avers that "[i]nstead of having Misconduct No. D207763 assigned to a Hearing Examiner, it was assigned to Unit Manager Ebony Frith for disposal". See Document No. 10.

ANSWER:  ADMITTED

74.  Further, Weekley alleges that "[u]nder the guise of disposing of Misconduct No. D207763, Unit Manager Ebony Frith moved [Weekley] off the unit and caused [him] to be removed from work assignment on that very same day (April 14, 2021)". See Document No. 10.

ANSWER:  ADMITTED

75.  Weekley avers that misconduct No. D207763 "was ultimately the adverse action which caused the removal of [his] housing and work assignment". See Document No. 10.

ANSWER:  ADMITTED

76.  Misconduct No. D207763 was designated as an informal misconduct. See Document No. 40-3.

ANSWER:  ADMITTED

77.  On the bottom righthand side of Weekley's exhibit in this matter--a copy of misconduct No. D207763--Weekley handwrote the following: "[Note] Removed from DB Honor Unit on Wednesday, 4/14/2021". See Document No. 40-3.

ANSWER:  DENIED.

78.  Weekley's institutional record does not contain any documentation of this informal misconduct, any sanctions allegedly imposed, or an appeal thereof. See Document No. 10; Document No. 40-3; Exhibit B; Exhibit F.

ANSWER:  ADMITTED

79.  Weekley has not been sanctioned for a misconduct since April 2016. See Exhibit D; Exhibit F.

ANSWER:  ADMITTED

80.  In his appeal of grievance No. 923794, dated April 29, 2021, Weekley claimed he was removed from his housing unit and job "for reasons not concerning disciplinary actions". See Exhibit D.

ANSWER:  Admitted, to the extent that the reasons were not legally and lawfully concerning disciplinary actions. See Brief in Opposition.

81. Along these lines, in his appeal dated August 2, 2021, Weekley averred his removal from the unit and his job occurred "without misconduct issued or work-related misconduct on 4/14/21". See Exhibit D.

ANSWER: Admitted, to the extent that Plaintiff was not issued a class-I misconduct or a misconduct report that was related to his work assignment.

82. Next, Weekley avers that a "verbal altercation" ensued when Sgt. Provident approached his cell on April 14, 2021. See Exhibit D; Document No. 10.

ANSWER: ADMITTED

83. At that time, Officer Wernicki and Abreu were conducting cell searches and Weekley alleges he requested their assistance. See Document No. 10; Exhibit D.

ANSWER: ADMITTED

84. During the investigation into Weekley's allegations in grievance No. 923794, staff members, including Officer Wernicki, were interviewed. Although Officer Wernicki confirmed that he had spoken with Weekley on April 14, 2021, he was "not able to connect the incident that [Weekley] mention[ed] in the grievance to why [he] [was] removed from [his] job". See Exhibit D.

ANSWER: DENIED. See Brief in Opposition.

85.  Ms. Frith was a unit manager at SCI-Albion from July 2018 until June 2021, and provided information relative to grievance No. 933794 and the circumstances surrounding Weekley's removal from the housing unit. See Exhibit D; Exhibit L [Declaration of Ebony Frith].

ANSWER:  Admitted, to the extent that Defendant Frith was a Unit Manager. Denied, regarding her providing information relative to grievance No. 933794 and the circumstances surrounding Plaintiff's removal from the housing unit.

86.  Ms. Frith reported that Weekley's behavior was being monitored from multiple negative interactions from weeks prior to [his] move from the unit... [he was] warned several times that [he] would be removed if [his] poor attitude persisted". See Exhibit D.

ANSWER:  DENIED. See Brief in Opposition. See also Attachment B.

87.  After receiving numerous warnings, Weekley was removed from the honor block due to his "inappropriate behavior" and being argumentative with staff on various occasions. See Exhibit D.

ANSWER:  DENIED. See answer to No. 86 above.

88.  During her tenure as a unit manager at SCI-Albion, Ms. Frith managed an incentive-based block, which is also referred to as an honor block/unit. See Exhibit L.

ANSWER:  ADMITTED

89.  The institution maintained a local policy regarding inmates' placement on and removal from the honor blocks; updates to this policy were issued via memorandum to unit management staff. See Exhibit B; Exhibit I [Incentive Block Admission Requirements]; Exhibit L.

ANSWER:  ADMITTED

90.  Decisions regarding placement on and removal from the honor blocks are made by the unit management teams, which are comprised of a counselor, unit manager, first shift officer, first sergeant, second shift officer, second shift sergeant, and unit psychologist. See Exhibit L.

ANSWER:  ADMITTED

91.  Weekley was housed on Ms. Frith's honor unit during the timeframe referenced in the civil complaint. See Exhibit L.

ANSWER:  ADMITTED

92.  Ms. Frith frequently received complaints from the honor unit staff, reporting that Weekley was not following the rules. See Exhibit L.

ANSWER:  DENIED. See Brief in Opposition. See also, Attachment B.

93.  These reports prompted discussions with the unit management team regarding whether it was appropriate for Weekley

to remain on the honor block. See Exhibit L.

     ANSWER:  DENIED. See answer to No. 92 above.

94. On February 3, 2021, the unit management staff issued Weekley a warning and he was advised that his continued poor attitude and behavior would not be permitted on the honor block. See Exhibit L; Exhibit M [Excerpt from Email Correspondence].

     ANSWER:  DENIED. See answer to No. 92 above.

95. Approximately one month later, in March 2021, Ms. Frith issued Weekley a final warning regarding his poor attitude and behavior. See Exhibit L; Exhibit M.

     ANSWER:  DENIED. See answer to No. 92 above.

96. The following month, on April 14, 2021, Weekley informed staff he was not feeling well and would not be reporting to his work assignment. See Exhibit M.

     ANSWER:  DENIED.

97. Sgt. Provident was notified, and in conformity with his normal practice when he receives this type of information regarding an inmate on the unit, he went to Weekley's cell to check on him. See Exhibit N.

     ANSWER:  DENIED.

98. Sgt. Provident inquired as to why Weekley was not reporting to his work assignment and asked whether he required

medical attention. See Exhibit J.

    ANSWER:  DENIED.

99.  In response, Weekley created a disturbance on the unit, raising his arms in a defensive posture, while shouting "black lives matter" at the top of his lungs. This interaction was witnessed by the other inmates on the unit. See Exhibit J; Exhibit L; Exhibit M.

    ANSWER:  DENIED.

100. Local institution policy provides that, among other reasons, inmates may be removed from incentive-based blocks for non-conformity to institutional or unit policies and for an overall negative attitude. See Exhibit L; Exhibit M.

    ANSWER:  ADMITTED.

101. In light of Weekley's disruptive behavior on April 14, 2021, the unit management team determined they could no longer support his continued housing on the honor unit. See Exhibit D; Exhibit L; Exhibit M.

    ANSWER:  DENIED. See Brief in Opposition. See also, Attachment B.

102. Although Sgt. Provident was a member of the unit management team at that time, he did not have the authority or ability to remove inmates from the honor unit. See Exhibit L; Exhibit J.

ANSWER:  ADMITTED.

103. "Sgt's and CO1's don't create moves to or from housing units"; "moves from unit to unit originate from unit management and are carried out as orders by the unit security staff". See Exhibit D.

ANSWER:  ADMITTED.

104. Sgt. Provident did not request to have Weekley removed from the honor unit. See Exhibit J.

ANSWER:  DENIED.

105. The unit management team collectively determined it was not appropriate for Weekley to remain on the honor unit at that time, due to his disruptive behavior. See Exhibit D; Exhibit J; Exhibit L.

ANSWER:  ADMITTED.

106. Therefore, Weekley was removed from the honor block and removed to another general population unit within the institution. See Exhibit L.

ANSWER:  ADMITTED.

107. Weekley's removal from the honor block necessitated his removal from his work assignment. See Exhibit D; Exhibit L.

ANSWER:  ADMITTED.

108. Specifically, Weekley was informed that he was removed

from his work assignment "based on need to maintain cohort integrity. CI workers are only housed on DB and G block to mitigate the spread of COVID-19". Further these "unit are honor blocks and your behavior does not warrant placement on those unit. Ultimately, it is the unit team's discretion whether or not to move you". See Exhibit D.

ANSWER: DENIED. See Brief in Opposition. See also, Attachment B.

109. In response to the COVID-19 pandemic, the DOC issued a policy that required all institutions to maintain inmate cohorts to mitigate the spread of the virus. See Exhibit D; Exhibit J; Exhibit L.

ANSWER: ADMITTED.

110. In line with this policy, the Correctional Industries ("CI") workers were all housed in cohorts on the D/B and G honor blocks in April 2021. See Exhibit D; Exhibit J; Exhibit L.

ANSWER: ADMITTED.

111. As such, when Weekley was removed from the honor block, he was also necessarily removed from his work assignment with CI to maintain cohort integrity. See Exhibit D; Exhibit J; Exhibit L.

ANSWER: ADMITTED.

112. Prior to the above-referenced incident on April 14,

2021, Sgt. Provident had not personally experienced any issues with Weekley. See Exhibit J.

ANSWER: DENIED. See Brief in Opposition.

113. Sgt. Provident believed that Weekley should be given another chance to reside on the honor unit and work at CI; therefore, he spoke with the CI supervisor, who indicated Weekley could return to CI if the unit manager agreed. See Exhibit J.

ANSWER: DENIED.

114. When Weekley was removed from the D/B honor block on April 14, 2021, he was housed on a general population until July 1, 2021. See Exhibit B.

ANSWER: ADMITTED.

115. In July 2021, the unit management team decided to return Weekley to the honor unit, following which he ultimately returned to a work assignment in CI. See Exhibit J.

ANSWER: ADMITTED.

116. Upon his return to the honor unit, Weekley was placed on a waiting list for a work assignment in CI and he sent an inmate request to a staff member, Ms. Roscinski, regarding his status on the list. Ms. Roscinski responded, "if you had kept your month shut you wouldn't have been moved off the housing unit. Now you must wait to get back to CI". See Exhibit D.

ANSWER: Admitted, to the extent that Ms. Roscinski was

told by others that Plaintiff had stated "Black Live Matter". Denied with regard to the fact that Plaintiff actually said "Black Lives Matter".

117. According to Weekley, Ms. Roscinski's response regarding his failure to keep his "month shut", was in reference the report of him yelling "'Black Lives Matter' to get kicked off the honor unit". See Exhibit D.

ANSWER:  ADMITTED. See answer to No. 116 above.

118. To date, Weekley remains housed on the honor unit. See Exhibit B.

ANSWER:  ADMITTED.


Dated:____/____/2024                    Respectfully Submitted,


_____
Monroe Weekley, III
Plaintiff, pro se
I.D. No. KS9184
SCI-ALBION
10745, Route 18
Albion, PA 16475-0002